J-S52028-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN RE: A.K.W. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: M.W., JR. | No. 657 MDA 2017 |

Appeal from the Decree March 22, 2017
In the Court of Common Pleas of Lancaster County
Orphans' Court at No(s): 2012 of 2016

BEFORE: GANTMAN, P.J., LAZARUS, J., and MUSMANNO, J.

MEMORANDUM BY LAZARUS, J.:           **FILED AUGUST 24, 2017**

M.W. ("Father") appeals from the decree entered in the Court of Common Pleas of Lancaster County, involuntarily terminating his parental rights to A.K.W. (DOB: August 2009), pursuant to 23 Pa.C.S. § 2511 of the Adoption Act.[1] After careful consideration, we affirm based on the well-reasoned trial court opinions of the Honorable Jay J. Hoberg.

J.D. ("Mother") and Father had a toxic relationship, which consisted of many verbal and physical disputes. Depending on the circumstances of Mother and Father's relationship, Mother and A.K.W. went back and forth between living with A.K.W.'s maternal grandparents and paternal grandparents from August 2009 until May 2010, when Mother went to basic training for the U.S. National Guard. Father lived with A.K.W.'s paternal

_____

[1] 23 Pa.C.S. §§ 2101 et seq.

grandparents, and he would perform parental duties when A.K.W. was at the paternal grandparents' home.

While Mother was at basic training, A.K.W. was in the care of the maternal grandparents, who permitted the paternal grandparents to have custody of A.K.W. on alternate weekends. Father was charged with burglary and incarcerated on September 8, 2010. In October 2010, Mother returned home and resumed raising A.K.W. Mother and A.K.W. lived primarily with the maternal grandparents, but Mother shared some periods of A.K.W.'s caretaking with paternal grandparents and maternal uncle. This custody arrangement was in place for more than a year while Father remained incarcerated.

Mother began a relationship with another man in January 2012. Mother, her paramour, and A.K.W. lived together for a year. Mother allowed paternal grandparents to have periodic custody of A.K.W during that time. Mother's relationship with her paramour ended in 2013, and she went back to living with maternal grandparents, but continued to allow paternal grandparents to have periodic custody of A.K.W.

Thereafter, Mother began dating T.D., and she moved in with him in October 2013. Father was living with paternal grandparents at this time and had contact with A.K.W. when Mother brought her to paternal grandparents' home, until January 2014 when Father began a relationship with another woman. Mother disapproved of Father's paramour because A.K.W. began imitating inappropriate behavior she claimed to have seen Father's paramour

do.  As a result, Mother communicated that she would not allow A.K.W. to be with Father when he was with his paramour.  Accordingly, Father did not see A.K.W. from January 2014 until March 2014, although he claims this was because Mother ignored his messages.

One night in March 2014, Father and his friend went to Mother's house and demanded custody of A.K.W.  Mother refused, an argument followed, and Father's friend put Mother in a chokehold.  Father left the residence with A.K.W., and Mother reported the incident to the police. The police determined that A.K.W. was at the paternal grandparents' home, and returned A.K.W. to Mother's custody.  Thereafter, Father was served with a temporary protection from abuse ("PFA") order, which became final after a hearing on June 11, 2014.  The PFA addressed custody by allowing Father to have partial physical custody and visitation rights as the parties agreed or until further order of the Court after a family business court presentation, custody conference, or a hearing regarding custody of the minor child.  PFA Order, 6/11/14, at 3.

After the incident in March 2014, Father had no contact with Mother or A.K.W. until April 2015.  Mother continued to coordinate visits with A.K.W. and her paternal grandparents, meeting them in public places because she did not want them to know where she and A.K.W. lived.  On April 28, 2015, Mother called paternal grandparents to let A.K.W. wish paternal grandfather a happy birthday.  While on speakerphone, Father spoke briefly to A.K.W. Accordingly, Mother ended the phone call and reported a PFA violation.

Mother ceased all contact with paternal grandparents, and approximately one week later, paternal grandfather made a Facebook post promising a reward in exchange for information regarding Mother's location. Father shared this post on his personal Facebook account, which was reported to the police as a second PFA violation, and the PFA was extended for three years.

Mother and A.K.W have not had any contact with Father or the paternal grandparents since the second PFA violation. On September 12, 2015, Mother married T.D. On September 21, 2016, Mother and T.D. filed a petition for adoption and involuntary termination of Father's parental rights.[2] Father was provided notice of the termination hearing on December 2, 2016. Father notified the court of his intention to contest the adoption proceeding, and the court appointed him counsel, as well as a guardian *ad litem* for A.K.W. A hearing took place on February 27, 2017, and the court ultimately terminated Father's parental rights to A.K.W. in a decree entered on March 22, 2017.

On appeal, Father raises the following issue for our review:

> Did the court err in finding that Father faced no barriers to the exercise of his parent-child relationship or that if such barriers existed, that he did not confront them with reasonable firmness?

_____

[2] Mother and T.D. amended their petition for adoption and involuntary termination of Father's parental rights on October 7, 2016; however, the amendment did not make any substantive changes to the original petition.

Appellant's Brief, at 4.

When reviewing a trial court's order terminating parental rights, our scope of review is broad and comprehensive, however, our standard of review is narrow. *In re C.M.S.*, 884 A.2d 1284, 1286 (Pa. Super. 2005). "We may uphold a termination decision if any proper basis exists for the result reached." *In re Adoption of K.J.*, 936 A.2d 1128, 1131 (Pa. Super. 2007) (internal citations omitted). We accept the findings of fact and credibility determinations of the trial court if they are supported by the record. *In re Adoption of S.P.*, 47 A.3d 817, 826 (Pa. 2012). If the record supports the factual findings, we must affirm the trial court's decision, even though the record could support an opposite result, unless we find the trial court made an error of law or abused its discretion. *In re Adoption of K.J.*, 936 A.2d at 1131.

After thorough review of Father's arguments, the record, and controlling case law, we rely upon the well-reasoned opinions of the Honorable Jay J. Hoberg in disposing of Father's claims. *See* Trial Court Opinion, 3/22/17; *see also* Trial Court Opinion, 5/11/17. Mother did not create insurmountable barriers to the relationship between Father and A.K.W. Trial Court Opinion, 3/22/17, at 7. Moreover, many barriers to Father's relationship with A.K.W. were of his own creation. Although the obstacles Father faced were not inconsequential, he did not confront those barriers with reasonable firmness for the reasons set forth in Judge Hoberg's opinions. We conclude, therefore, that the trial court properly found that the

evidence was sufficient to involuntarily terminate Father's parental rights pursuant to sections 2511(a)(1) and (b) of the Adoption Act.

Accordingly, we affirm the decree involuntarily terminating Father's parental rights to A.K.W., and direct the parties to attach a copy of Judge Hoberg's opinions in the event of further proceedings. **See** Memorandum Opinion and Decree, 3/22/17; Opinion Sur Appeal, 5/11/17.

Decree affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>8/24/2017</u>

COURT OF COMMON PLEAS OF LANCASTER COUNTY, PENNSYLVANIA
ORPHANS' COURT DIVISION

IN RE:
    A    K    W        :        No. 2012 of 2016

INVOLUNTARY TERMINATION    :

## MEMORANDUM OPINION AND DECREE

This matter comes before the Court on the Petition filed by T   D   (hereinafter "Stepfather") and J   D   (hereinafter "Mother") to terminate the parental rights of M   W   r (hereinafter "Father") as to his daughter A   K   W   (hereinafter "A.K.W."). A Petition for Adoption was originally filed by Petitioners on September 21, 2016 and an Amended Petition for Adoption and Involuntary Termination of Parental Rights was filed on October 7, 2016. Petitioners assert that the parental rights of Father should be terminated pursuant to 23 Pa. C.S.A. Section 2511(a)(1). Notice of the hearing was provided to Father on December 2, 2016 through first-class mail. Father subsequently notified this Court of his intention to contest the adoption proceeding. This Court appointed counsel for Father and appointed a Guardian ad-litem for the child. A hearing was held on February 27, 2017 in which all parties were present with counsel. The parties reside in Lancaster County, Pennsylvania.

A.K.W. is a minor female child who was born on August 2009 to Mother and Father at Ephrata Community Hospital in Lancaster County. Mother and Father were not married at the time of the child's birth and Father is not listed on the child's birth certificate. From August 2009 to May 4, 2010, Mother raised A.K.W. in both Maternal Grandparents' home and Paternal Grandparents' home (where Father lived), depending on the circumstances. Mother and Father had a toxic relationship with numerous physical and verbal altercations. When Mother and Father were fighting Mother would bring A.K.W. to Maternal Grandparents home. When

Mother and Father were on good terms, or when Mother and Maternal Grandparents were fighting, Mother would bring A.K.W. to Paternal Grandparents home. Father lived with Paternal Grandparents and would perform parental duties when the child was in the home.

Mother enlisted in the National Guard of the United States and was in basic training from May 4; 2010 to October 1, 2010. During this time A.K.W. was in the care of Maternal Grandparents who permitted Paternal Grandparents to have custody of the child on alternate weekends. On September 8, 2010, Father was charged with burglary and was incarcerated. In October of 2010, Mother returned home from basic training and resumed the caretaking role. The child primarily lived with Mother at Maternal Grandparents home, but the child would also spend periods of time in the care of Paternal Grandparents and Maternal Uncle. This loose custody arrangement continued for more than a year. Father was in jail at this time and remained in jail for the majority of 2011.

From October 2011 to December 2011, Mother reported that she was undergoing mental stress and financial instability so she left A.K.W. in the care of Maternal Uncle. During this period, she attempted to transfer legal custody to Maternal Uncle. Father refused to consent.

In January of 2012 Mother began a relationship with another man, and she retook caretaking duties for A.K.W. Mother, her paramour, and A.K.W. lived together for approximately one year and she allowed Paternal Grandparents to have periodic custody of the child. During this period of time, Mother and her paramour had a child. When the relationship with her paramour dissolved in 2013, Mother went back to live with Maternal Grandparents and continued to allow Paternal Grandparents to have periodic custody of A.K.W.

Mother began dating Stepfather in 2013 and in October of that year they moved in together. Father was living with Paternal Grandparents at the time and until January 2014 Father was having contact with his child when Mother brought the child to the home. Also around this time, Father began a relationship with another woman. Mother disapproved of Father's paramour and Mother communicated that she would not allow the child to be with Father and paramour without supervision.[1] Accordingly, Father did not see his daughter from January 2014 to March 2014. At some point in March, Father and a friend of his came to the Mother's home and demanded custody of A.K.W. Mother refused to give Father custody of the child. An altercation ensued which culminated in Father's friend putting Mother in a chokehold which caused Mother to lose consciousness. Father then took the child and left the residence.

Mother reported the incident to Ephrata police and filed for a temporary Protection from Abuse order (PFA). The police determined that A.K.W. was at Paternal Grandparents home and they retook custody of the child. Father was at Paternal Great-Grandfather's home and was served with the PFA. Police returned A.K.W. to Mother's custody on that same night.

Also on that night, Paternal Grandmother accused Maternal Grandfather of raping A.K.W. The child, who was four years old at the time, was taken to a hospital to assess potential injuries consistent with rape. There was no evidence to support the claim. Nevertheless, the accusation prompted the Lancaster County Children and Youth Agency to investigate Maternal Grandparents and the family. The investigation concluded the allegations were unfounded and the case was closed.

---

[1] Father's paramour was an exotic dancer and Mother reported that the child began to act out in a sexual manner. The child was old enough to communicate that she was imitating the behavior of father's paramour.

A temporary PFA order was granted on March 11, 2014. A full hearing was subsequently held and a final PFA order was issued on June 11, 2014. The final PFA order contained a finding of abuse and issued a PFA against Father. The pertinent language of the PFA order addressed custody: "defendant shall have the following partial physical custody/visitation rights: as the parties agree or until further order of the Court after a family business court presentation, custody conference, or a hearing regarding custody of the minor child." Father to this date has not appealed this order, filed for custody, or formally requested visitation in Family Business Court. Father and Paternal Grandfather testified that they sought legal counsel but determined that they were unable to afford an attorney to challenge custody. Paternal Grandfather testified that in his opinion, Father had limited reading and cognitive ability and would be incapable of self-filing a petition.

After the final PFA order in March of 2014, Father did not have any contact with Mother or A.K.W. until April of 2015. Mother continued to take A.K.W. to visit Paternal Grandparents for lunch or dinner once a month over the course of this year. Mother testified that she met Paternal Grandparents in a public place because she did not want them to know where she lived. She also testified that she called them from an unknown number. On April 28, 2015 Mother called Paternal Grandparents to allow A.K.W. to wish Paternal Grandfather a happy birthday. While on speakerphone, Father briefly spoke to his daughter. At that point, Mother terminated the phone call and reported a PFA violation. Mother ceased all contact with Paternal Grandparents after that day. Eight days later Paternal Grandfather made a Facebook post promising a reward in exchange for information about Mother's whereabouts. Father shared this posting through his own personal Facebook account. Mother's cousin viewed Father's post and

communicated its contents to Mother and to the police. Mother reported this as a second PFA violation.

Father was found not guilty of the first violation involving the phone call with A.K.W. Father was found guilty of the second violation of the Facebook post. As a result, the PFA was extended for three years. On September 12, 2015, Mother and Stepfather were married. On October 7, 2016 the Amended Petition for Adoption and the Involuntary Termination of Father's rights was filed before this court. Father was incarcerated on December 22, 2016 pending the outcome of a harassment charge in which Father was alleged to have physically assaulted his fiancé. Mother and A.K.W. have not had contact with either Father or Paternal Grandparents since the second PFA violation. Father has not seen the child since March of 2014.

The termination of parental rights is governed by statute. In re Child M., 452 Pa. Super. 230, 681 A.2d 793 (1996). The pertinent part of the statute 23 Pa. C.S.A. §2511 provides as follows:

> (a) GENERAL RULE. – The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.
>
> (b) OTHER CONSIDERATIONS. – The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving notice of the filing of the petition.

The party seeking termination has the burden of establishing clear and convincing evidence that parents have failed to perform their parental duties. In re C.M.S., 832 A.2d 457 (Pa. Super.

2003). Clear and convincing evidence exists when testimony given is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." In re J.L.C. & J.R.C., 837 A.2d 1247, 1251 (Pa. Super. 2003). In termination proceedings, the Court must focus on the conduct of the parent and determine if that conduct justifies a termination of parental rights. In re B., N.M., 856 A.2d 847, 854-855 (Pa. Super. 2004), *citations omitted.* In order to protect his parental rights, a parent must do more than merely state he does not wish to have his parental rights terminated. In re C.M.S., 832 A.2d 457, 464 (Pa. Super. 2003), *citing* In re E.S.M., 622 A.2d 388, 395 (Pa. Super. 1993).

To support a finding for termination under Section (a)(1), Petitioners must present clear and convincing evidence of a settled purpose of relinquishing parental claim to a child or that the parent has refused or failed to perform parental duties for a period of six months. Parental duty has been defined as follows:

> There is no simple or easy definition of parental duties. Parental duty is best understood in relation to needs of a child. A child needs love, protection, guidance and support. These needs, physical and emotional, cannot be met by a merely passive interest in development of the child. Thus, this court has held that the parental obligation is a positive duty, which requires affirmative performance.

> This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child.

> Because a child needs more than a benefactor, parental duty requires that a parent exert himself to maintain a place of importance in the child's life.

In re C.M.S., 832 A.2d 457, 462 (Pa. Super. 2003), *citing* In re Burns, 379 A.2d 535 (Pa. Super. 1997). A parent must take affirmative steps to maintain a relationship with his or her child to the best of his or her ability under the circumstances as they exist. In re D.J.S., 737 A.2d 283, 287

6

(Pa. Super. 1999). "A parent is required to exert a sincere and genuine effort to maintain a parent-child relationship; the parent must use all available resources to preserve the parental relationship and must exercise 'reasonable firmness' in resisting obstacles placed in the path of maintaining the parent-child relationship." In re C.M.S., *supra* at 462, *citing* In re Shives, 525 A.2d 801, 803 (Pa. Super. 1987).

The Court after hearing all testimony and reviewing the exhibits presented at the time of the hearing finds that Petitioners have met their burden under Section 2511(a)(1) and have established by clear and convincing evidence that Father, through his conduct, evidenced a settled purpose of relinquishing his parental claim to A.K.W. and has failed and refused to perform any parental duties for the period of at least six months preceding the filing of this petition. Father has not seen A.K.W. for almost three years and has not performed any parental duties during this time. He has not paid or offered support. He has not sent the child cards or gifts. He did not petition for custody of A.K.W. Instead, Father violated the PFA order. He violated his parole. He has been in and out of jail almost every year since the child was born. He missed almost an entire year of his child's life due to his incarceration for burglary in 2011.

Mother did not create insurmountable barriers in the relationship between Father and A.K.W. Mother changed her phone number and residence after the March 2014 incident with Father. She made efforts to conceal this information from Paternal Grandparents so that a future incident would not occur. However, she still maintained contact with them through Facebook and occasional meetings until April 2015, in which Father spoke on the phone to A.K.W. during a call that was supposed to be between the child and Paternal Grandfather. After that incident the trust between Mother and Paternal Grandparents was broken and she cut off contact with them. Even though Father could no longer communicate about visitation through Paternal

Grandfather, he could have filed for custody, as permitted in the PFA Order. If he has the cognitive issues related by Paternal Grandfather, he certainly could have asked for help from his family to process the paperwork required to self-file.

The only barrier to the relationship between Father and the child is of his own creation. Father made the short-sighted decision to retake custody of his child by force. As a result, a PFA order was issued which limited his contact with Mother and A.K.W. His inability to comply with the PFA in 2015 is the sole reason that it was extended to 2017. The PFA order still left Father with the opportunity to petition the court for custody of his child. Father testified that he talked to a few attorneys and determined that it was going to be too expensive to pursue. This is not a display of reasonable firmness in the face of obstacles. It is yielding to the status quo. Father had options. He could have consulted other attorneys or pursued a monthly fee arrangement. He could have obtained employment to afford an attorney. He could have filed the petition himself. Father did nothing to reestablish a relationship with his child. Accordingly, this Court finds that Petitioners have met their burden under Section 2511(a)(1) in establishing that Father has failed to perform parental duties for six months prior to filing the petition.

The Court must next consider whether or not termination of parental rights is in the best interest of the child under Section 2511(b). It is not a mere formality flowing from the existence of the other required elements; rather, it is a discrete consideration. In re Involuntary Termination of C.W.S.M., 839 A.2d 410 (Pa. Super. 2003). Section 2511(b) centers judicial inquiry upon the welfare of the child rather than the fault of the parent. In re A.R., 837 A.2d 560 (Pa. Super. 2003). In making this determination, the Court must carefully consider the tangible dimension as well as the intangible dimension – the love, comfort, security and stability – entailed in a parent-child relationship. In re T.B.B., 835 A.2d 387 (Pa. Super. 2003).

8

The bond between a child and a parent is a proper matter to be evaluated in a termination of parental rights case. In re S.M.B., 856 A.2d 1235 (Pa. Super. 2004). Considering what situation would best serve the child's needs and welfare, the court must examine the status of the bond between the natural parent and the child to consider whether terminating the parent's rights would destroy an existing, necessary and beneficial relationship. In re Adoption of T.B.B., supra. A child has the right to proper parenting and fulfillment of her potential in a permanent, healthy, and safe environment. In re J.A.S., 820 A.2d 774, 782 (Pa. Super. 2003).

Based upon the evidence presented at the time of the hearing and careful review of the record, it is apparent that terminating Father's parental rights is in the best interest of this child. The Court in reaching this conclusion places considerable weight on the written recommendation of the Guardian *ad litem* that was received by the Court on February 28, 2017. The Guardian *ad litem* supports the termination of Father's rights.

A.K.W. has resided with Mother his entire life and with Mother and Stepfather since October 6, 2013. Stepfather has been providing for A.K.W.'s developmental, emotional, and physical needs for almost half of her life. Mother and Stepfather are able to co-parent A.K.W. and her two half-siblings while maintaining a safe and stable home life. Mother is able to devote her time to caring for the children during the day and the household income is sufficient to provide for the family's needs. A.K.W. has a right to a stable and loving family that will be able to fulfill her needs in a healthy and safe environment. Father cannot provide that. He is currently incarcerated for a parole violation and has pending charges of harassment against his fiancé and Paternal Grandmother. He has never maintained stable employment and does not have income sufficient to meet A.K.W.'s needs.

9

Moreover, terminating Father's parental rights would not destroy an existing, necessary, and beneficial relationship. While this Court heard opinion testimony from Paternal Grandfather and the child's Godfather about the strong bond that Father shared with A.K.W., that testimony predated the March 2014 incident. That incident and Father's subsequent lack of contact changed the relationship between Father and A.K.W. The Guardian *ad litem* spoke with the child and the child remembers the incident in which Father took her away from her Mother. Child related that she has no desire to see Father. Father's actions and subsequent lack of any involvement in the child's life has destroyed whatever bond he previously shared with A.K.W. Moreover, Father has not seen A.K.W. or maintained a relationship with her for over three years. Stepfather has filled the void created by Father. He has established a strong and meaningful bond with A.K.W. who now views him as her father.

Based upon the evidence presented and having resolved all issues of credibility, the Court finds for the above stated reasons that the Petitioners have established by clear and convincing evidence that the parental rights of Father should be involuntarily terminated as requested, and that the termination will promote and enhance the developmental, physical and emotional needs and welfare of A.K.W. Accordingly, the Court enters the following Decree:

IN THE COURT OF COMMON PLEAS OF LANCASTER COUNTY, PENNSYLVANIA
ORPHANS' COURT DIVISION

IN RE:

A'   K   W      :     No.    2012 of 2016

INVOLUNTARY TERMINATION   :

## DECREE

AND NOW, this 22 day of March, 2017, the Court decrees that:

The parental rights and duties of M  , W   Jr., father of A   K  W   including the obligation of support, shall be and are hereby forever terminated pursuant to Section 2511 (a)(1) and (b) of the Adoption Act. M  W  Jr. shall be hereafter without any power or right to object to or receive notice of adoption proceedings concerning said Child. Custody of said Child shall remain with J   and T  D  who shall have all powers, rights, and authority concerning said Child as specified in the Adoption Act.

M  W  Jr. is hereby advised of his right to file an appeal to the Pennsylvania Superior Court within thirty (30) days after the date of this Decree pursuant to the Pennsylvania Rules of Appellate Procedure. The Clerk of the Orphans' Court is directed to send a copy of this decree to all counsel and to the father of the child by first class mail at their last known addresses and to note on the docket the date of mailing. The clerk is further directed to send to the Father of the child notice of the right to place information on file with the PA Department of Health, Division of Vital Records, as provided by the Adoption Act and the right to place medical information on file with the Dept. of Welfare as provided by the Adoption Act.

BY THE COURT:

_____
Jay. J. Hoberg, Judge

ATTEST: _____

Copies to:    Andrew Spade, Esq.          Pamela Breneman Esq.
           Daniel Shertzer, Esq.          M  W  

2

# COURT OF COMMON PLEAS OF LANCASTER COUNTY, PENNSYLVANIA
## ORPHANS' COURT DIVISION

IN RE:                  :

     A.K.W.               :     No. 2012 of 2016

                           :

INVOLUNTARY TERMINATION    :     SUPER. CT. DKT. NO.: 657 MDA 2017

## OPINION SUR APPEAL

On September 21, 2016, T.D. (hereinafter "Stepfather") and J.D. (hereinafter "Mother") filed a petition to terminate the rights of M.W. as to his biological daughter A.K.W. (hereinafter "A.K.W."). An Amended Petition for Adoption and Involuntary Termination of Parental Rights was filed on October 7, 2016. Notice of the hearing was provided to M.W. on December 2, 2016 through first-class mail. M.W. subsequently notified this Court of his intention to contest the adoption proceeding. This Court appointed counsel for M.W. and appointed a Guardian ad-litem for the child. A hearing was held on February 27, 2017 in which all parties were present with counsel. On March 22, 2017, after hearing all testimony, this Court issued a Memorandum Opinion and Decree terminating M.W.'s parental rights. The Court incorporates the March 22, 2017 Memorandum Opinion as if fully set forth herein.

M.W. filed a timely Notice of Appeal on April 17, 2017, and asserts two issues in his 1925(b) statement. M.W. argues that there was insufficient evidence to support the Court's finding that Petitioners met their burden of proof in showing that M.W. evidenced a settled purpose of relinquishing his parental claim to his daughter and that there was insufficient evidence to support the Court's finding that the termination of M.W.'s rights were in the child's best interest.

Although this Court believes that the sufficiency of the evidence is addressed by the Memorandum Opinion entered on this matter, to ensure complete coverage of the issues, this Court herein submits this brief Opinion Sur Appeal.

First, M.W. asserts that there was insufficient evidence to support the Court's finding that he evidenced a settled purpose of relinquishing his parental claim to his daughter. The totality of the evidence was discussed at length in a detailed explanation of the current case law and its application to this case in the Memorandum Opinion. The last time M.W. saw A.K.W. was when he forcibly removed her from her Mother's custody in March of 2014. This action led to a PFA Order which limited his contact with Mother and A.K.W. as could be agreed on by the parties or through Court Order after a petition for custody. M.W. has never taken any action in the three years since the PFA Order which would suggest that he was committed to being a father to this child. He did not petition for custody of his child. He violated the PFA Order which led to its extension. He has not provided support for A.K.W. Accordingly, Appellee established by clear and convincing evidence that M.W.'s parental rights should be terminated under Section 2511(a)(1).

Second, M.W. asserts that there was insufficient evidence for this Court to find that the best needs and welfare of the child would be served by a termination of parental rights. The totality of the evidence was discussed at length in a detailed explanation of the current case law and its application to this case in the Memorandum Opinion. While the record demonstrates that M.W. did partially parent during the first few years of A.K.W.'s life, any bond they may have shared was severed when he forcibly took custody of her in March of 2014. The child communicated to the Guardian ad-litem that she remembers the night that she was taken from her mother and she has no desire to see M.W. again. In the three years since that incident,

2

Stepfather has filled the paternal void left by M.W. The record demonstrates that the child has been in the sole care of Appellees since October of 2013 and is thriving in that environment. Accordingly, this Court found that terminating M.W.'s parental rights were in the child's best interest under Section 2511(b).

The Court therefore remains resolute in its decision that Appellees established by clear and convincing evidence that the parental rights of M.W. to A.K.W. should be terminated pursuant to Section 2511(a)(1) and that the termination of M.W.'s rights is in the best interest of the child pursuant to Section 2511(b). The Clerk of the Orphans' Court is directed to transmit the record to the Superior Court.

BY THE COURT:

Date: _____May 11 2017_____

_____
JAY J. HOBERG, JUDGE

ATTEST: _____

Copies to:
Daniel H. Shertzer, Jr., Esquire – Attorney for Appellant
Andrew E. Spade Esquire – Attorney for Appellee
Pamela J. Breneman, Esquire – Guardian ad Litem

3